**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CR. NO. 2:06-cr-089-WKW-CSC** |
| | ) | |
| **FREEMAN STEVENSON, JR.,** | ) | |
| **a/k/a "PONCHO"** | ) | |
| | ) | |

---

**United States' Response to Defendant's Motion to Suppress**

---

Freeman Stevenson's Motion to Suppress should be denied. Stevenson complains that his stop by the police was unconstitutional and that his statements to the police were taken in violation of *Miranda*. Both contentions are meritless. First, the police had a reasonable and articulable suspicion, which justified the stop of Stevenson. Not only did Stevenson fit the description of a recent burglary suspect, he also was driving a truck--the description of which almost identically matched the description from two eye-witnesses--approximately two blocks from the scene of the burglary. The police therefore were justified in performing a *Terry* stop of Stevenson.

Moreover, Stevenson was not entitled to a *Miranda* warning when he was stopped. He was not in police custody when he told police that his nickname was "Poncho;" the same nickname of the person that eyewitnesses told police was involved in the burglary. In fact, it was one of the first questions that police asked Stevenson after they stopped him. Stevenson was therefore not in custody and was not entitled to *Miranda* warnings.

Stevenson's motion should therefore be denied. As grounds to support its position,

the United States submits the following:

## I.     Background

On September 5, 2005, Montgomery Police Officers Lance Gambrel and Cedric Hebert responded to a burglary complaint at 678 West Jeff Davis Avenue.  After speaking with the victim and surveying the scene, Gambrel and Hebert spoke with two of the victim's neighbors.  These neighbors told police that they had seen two African-American males taking items out of the house and placing them into several vehicles.  The witnesses recognized one of the males as a drug dealer from the area.  They described him as an older gentleman with a slim build and a medium complexion with salt and pepper colored hair. They also noted that he wore his hair in plaits, which were around two inches long.[1]  They stated that he went by the nickname of "Poncho."  Finally, both witnesses advised that Poncho used a champagne-colored Ford F-150 pick-up truck with wheel spinners[2] and with a hard-shelled bed cover to haul off the loot from the burglary.[3]

Ten days later, Gambrel and Herbert were on patrol around two blocks away from the scene of the burglary when they observed a tan 1997 Ford F-150 with spinner rims and a hard-shelled truck bed cover containing two African-American passengers, heading west on Jeff Davis Avenue.  After stopping the truck, Gambrel, as the lead officer, then approached

---

[1] Later, after the arrest in this case, both witnesses positively identified Stevenson from a photo line up.

[2] During one of the witness's statements, that witness also stated that the front driver's side spinner was missing.

[3] Both witnesses later provided similar recorded statements to Corp. C. J. Coughlin, copies of which are attached hereto, respectively, as Exhibits A and B.

the front, driver's side of the vehicle and spoke with the driver, who matched the burglar's description. Stevenson then identified himself. When Gambrel asked him if he had any nicknames, Stevenson replied "Poncho."

Gambrel then performed a warrant check and discovered that Stevenson had an outstanding warrant for failure to pay child support. After Gambrel removed Stevenson from the vehicle, he placed him under arrest.[4] An inventory search of the Ford F-150 uncovered a loaded and cocked pistol wedged into the crack of the truck's backseat.

## II.     Arguments

### A.     Gambrel's Had a Reasonable, Articulable Suspicion to Stop Stevenson's Truck. Thus, the Stop Was Lawful.

Gambrel lawfully stopped Stevenson because Gambrel had a reasonable and articulable suspicion[5] that Stevenson was involved in or was wanted in connection with a felony. "[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion."[6] The *Terry* stop

---

[4] After Stevenson was taken to the rear of Gambrel's unit and patted down, Stevenson began to struggle with Gambrel in an order to hide something – later it was discovered to be a quantity of illegal drugs. Herbert assisted Gambrel in subduing Stevenson and in later collecting the drugs. Stevenson was later charged with state drug charges.

[5] The United States concedes that officers did not have probable cause at the time of Stevenson's stop to believe that he had committed a crime. That probable cause did not arise until (1) Gambrel observed further similarities in Stevenson to the description of the burglar and (2) Stevenson identified himself as "Poncho."

[6] *United States v. Hensley*, 469 U.S. 221, 229 (1985); *see also United States v. Strickland*, 902 F.2d 937 (11th Cir. 1990) (An "[o]fficer may conduct brief investigative stop of vehicle, analogous to *Terry* -stop, if seizure is justified by specific articulable facts sufficient to give rise to reasonable suspicion of criminal conduct.").

standard is not a difficult standard to meet. "Indeed, the standard that must be satisfied to justify a *Terry* stop or search is significantly less onerous than is a showing of probable cause to arrest."[7]

Because Stevenson does not take issue with the scope of the *Terry* stop or the length of his detention before his arrest, the sole issue is whether Gambrel had a reasonable, articulable suspicion to stop Stevenson's truck. To justify pulling Stevenson's vehicle over for a *Terry* stop, Gambrel must "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."[8] Reasonable suspicion is determined by the totality of the circumstances,[9] but at minimum it must "be more than an 'inchoate and unparticularized suspicion or hunch.'"[10] Rather, the Fourth Amendment requires that Gambrel articulate facts that provide some minimal, objective justification for his stop.[11]

Gambrel had reasonable and articulable facts which warranted the stop. Two witnesses to the alleged burglary advised him that a suspect used a champagne colored Ford F-150 pick-up truck with wheel spinners and with a hard-shelled truck bed cover to carry items from the burglary at 678 West Jeff Davis Avenue. Ten days later, Gambrel was on

---

[7] *United States v. Dunn*, 345 F.3d 1285, 1289 (11th Cir. 2003).

[8] *Terry v. Ohio*, 392 U.S. 1, 21 (1968).

[9] *See United States v. Lee,* 68 F.3d 1267, 1271 (11th Cir.1995).

[10] *Terry,* 392 U.S. at 21.

[11] *United States v. Williams,* 876 F.2d 1521, 1524 (11th Cir. 1989).

patrol two blocks away from the site of the burglary at the 800 block of West Jeff Davis

Avenue, when he observed a practically identical truck to the one that the witnesses

described to him–a tan 1997 Ford F-150 with spinner rims and a hard-shelled truck bed

cover.  Based on these facts, Gambrel's stop is supported in law and in reason.

In *United States v. Aldridge*,[12] for example, a police officer stopped defendant

Aldridge's car after the officer had received information over his police radio that suspicions

persons were tampering with a vehicle at a construction site.[13]  The information also included

detailed information about the suspect's automobile, including size, color, and a broken tail

light.[14]  The officer proceeded to the site and within one mile of the construction area,

observed a vehicle fitting the description, traveling in the opposite direction.[15]  In concluding

that the stop was reasonable, the Eleventh Circuit noted that "an investigative stop will be

upheld if the officer observes facts corroborating even the innocent details of tips from

informer."[16] Similarly, here, Gambrel possessed detailed and very distinct information about

Stevenson's truck from two eye-witnesses, which he later confirmed within two blocks of

the scene of the crime. Viewed objectively here, the stop therefore was not based upon a

---

[12] 719 F.2d 368 (11th Cir. 1983).

[13] *Id.* at 371

[14] *Id.*

[15] *Id.*

[16] *Id.*; *compare with United States v. Rias*, 524 F.23d 118, 121 (5th Cir. 1975) (no reasonable suspicion when officer stopped two Black males because they were in a black Chevrolet, when the only information that officer possessed was that two Black males were in a blue or black Chevrolet.)

hunch, but upon specific and articulable facts that justify Gambrel's stop.

Nevertheless, despite compelling and articulated reasons for the stop, Stevenson maintains that the stop was unconstitutional because a ten day period of time elapsed between the witnesses' information and the stop. And thus, he reasons, the information had gone stale.

Stevenson's argument while seductive, is unavailing. "Staleness is to be determined on the facts of each case."[17]  For example, the Fifth Circuit has expressly rejected the argument that staleness can be determined by simply a "mechanical counting of the time between" the time the tip is received and the time the tip is used.[18]  In fact, in both *United States v. Gonzalez*[19] and *United States v. Villalobos*[20] the Fifth Circuit rejected the argument that <u>two month</u> old anonymous tip was stale, and therefore unreliable for purposes of a reasonable suspicion determination.  The time between the information and the *Terry* stop of Stevenson's vehicle–a mere ten days–is likewise uncompelling.

As a result, Gambrel's stop was justified.  Such a conclusion only makes sense when one examines the policy behind *Terry*.  *Terry* stops are reasonable not only because of the government's interest in investigating and alleviating officers' suspicions of illegal activity, but also because of the limited intrusiveness of such stops.  In this case, Gambrel had stopped

---

[17]  *United States v. Webster,* 734 F.2d 1048, 1056 (5th Cir.1984).

[18]  *Id.*

[19]  190 F.3d 668, 673 (5th Cir. 1999).

[20]  161 F.3d 285, 290 (5th Cir. 1998).

Stevenson only for a minute or so before Stevenson had confirmed that he was Poncho.

Stevenson's motion should therefore be denied.

### B.    Stevenson Was Not in Custody When He Identified Himself As "Poncho." Thus, no *Miranda* Warnings Were Necessary.

The Government does not dispute that *Miranda* warnings were not given and that

Stevenson's statement were made in response to interrogation. The *Miranda* rule, however,

applies only to a statement made during *custodial* interrogation. As a result, Stevenson

cannot sustain his burden of demonstrating that he was in custody.[21] Normally, a person is

in custody when "under the totality of the circumstances, a reasonable [person] in the

suspect's position would feel a restraint on [her] freedom of movement . . . to such extent that

he would not feel free to leave."[22]

In the special context of *Terry* stops, however, *Miranda* custodial test is not applied

literally.  If it were, "the result would be that *Miranda* warnings [would be] required before

any questioning could occur during any *Terry* stop."[23] Cases requiring a *Miranda* warning

during a *Terry* stop are rare.  Typically they involve a lengthy detention, which were

conducted under coercive circumstances and which were out of the public eye.  In these

cases, suspects are "subjected to restraints comparable to those associated with a formal

---

[21]*See People v. Charles*, 738 F.2d 686, 691-92 (5th Cir. 1984) ("[D]efendants' burden required that at a minimum they demonstrate that the . . . statements were obtained while they were under custodial interrogation.").

[22] *United States v. Phillips*, 812 F.2d 1355, 1360 (11th Cir. 1987) (citations omitted).

[23] *United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004).

arrest."[24]

For example, in *United States v. Perdue*[25]–which has been relied upon by the Eleventh Circuit–"the suspect, along with his pregnant fiancée, were stopped in 'an isolated rule area not subject to the public's scrutiny' . . . . [Both] were forced or ordered to the ground, and as the officers kept their guns drawn on [them, and while helicopters circled overhead,] . . . they were questioned."[26] Likewise, in *United States v. Brito-Melo*,[27] the defendants, who spoke limited English, "had their car taken away from them, were placed in locked police cars, and were involuntarily driven separately to a different location,"[28] where ten to twelve officers were located along with a canine. At the new scene, they were "kept in the cruisers . . . for about forty minutes or more."[29]

Such is not the circumstance here. After stopping Stevenson's truck, Gambrel then approached the front, driver's side of the truck and spoke with Stevenson. Stevenson then identified himself. When Gambrel asked him if he had any nicknames, Stevenson replied "Poncho." His admission was one of the first questions that police asked Stevenson after they stopped him.

---

[24] *Berkemer v. McCarty*, 468 U.S. 420, 441 (1984). Such a scenario is rare; in fact the Supreme Court noted there was an "the absence of any suggestion in [the Court's] opinions that *Terry* stops are subject to the dictates of *Miranda*." *Id.* at 440 (dictum).

[25] 8 F.3d 1455, 1466 (10th Cir. 1993) (cited by *Acosta*, 363 F.3d at 1150).

[26] *Id.*

[27] Crim. Case No. 05-10227-PBS, 2006 WL 2559860 (D. Mass. Sept. 5, 2006).

[28] *Id.* at *7.

[29] *Id.*

Moreover, instead of being detained in a remote area far from public scrutiny, Stevenson was stopped on a public street in a residential neighborhood. Additionally, the officers' actions were visible to anyone in the area who chose to look. Stevenson was not questioned at gunpoint, not forced to lie face down when questioned. In fact, no physical force was used against him during this questioning. He was not handcuffed. He was not even placed in a police car at the time. The restraint to which Stevenson was subjected during the *Terry* stop is the minimal amount necessary for such a stop.

Because Stevenson cannot met his required burden to demonstrate that the stop involved the type of "highly intrusive" coercive atmosphere that could require *Miranda* warnings even before a formal arrest is made, Stevenson's motion fails. It should therefore be denied.

## III.    Conclusion

Gambrel's stop of Stevenson was justified. Likewise Stevenson has failed to sustain his burden of demonstrating that he was subject to custodial interrogation. His motion should therefore be denied on both issues.

Respectfully submitted this 12th day of September, 2006.,

LEURA G. CANARY
UNITED STATES ATTORNEY

/s/ Christopher Snyder
CHRISTOPHER A. SNYDER
Assistant United States Attorney
One Court Square, Suite 201
Montgomery, AL 36104
Phone: (334) 223-7280

Fax: (334) 223-7135
E-mail: christopher.a.snyder@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 12, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following: Anne Borelli.

/s/ Christopher Snyder
CHRISTOPHER A. SNYDER
Assistant United States Attorney